UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

PECOLA COUSAR,

                              Plaintiff,                    **MEMORANDUM & ORDER**
                                                            16-CV-1784 (MKB)
                    v.

NEW YORK-PRESBYTERIAN/QUEENS,

                              Defendant.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Pecola Cousar, proceeding *pro se*, commenced the above-captioned action on

April 13, 2016, against Defendant New York-Presbyterian/Queens, (Compl., Docket Entry No.

1), and on January 26, 2018, filed an Amended Complaint, alleging violations of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Americans with

Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), and New York State Human Rights

Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), (Am. Compl., Docket Entry No. 42).  Plaintiff

asserts claims pursuant to (1) Title VII for race and color discrimination, retaliation, and hostile

work environment, (2) the ADA for denial of a reasonable accommodation and discrimination,

and (3) NYSHRL for discrimination and retaliation.  (*Id.*)

        Currently before the Court is Defendant's motion for summary judgment as to all claims,

(Def. Mot. for Summ. J. ("Def. Mot."), Docket Entry No. 81; Def. Mem. in Supp. of Def. Mot.

("Def. Mem."), Docket Entry No. 87), and Plaintiff's cross-motion for summary judgment, (Pl.

Aff. Request for Summ. J. ("Pl. Request"), Docket Entry No. 59; Pl. Aff. in Resp. to Def. Mot.

("Pl. Resp."), Docket Entry No. 92; Pl. Mem. of Law in Supp. of Pl. Response ("Pl. Mem."),

Docket Entry No. 95).[1]  Plaintiff also moves for leave to file a second amended complaint;

Defendant opposes this request.  (Pl. Mot. for Leave to File Second Am. Compl. ("Pl. Mot. for

Leave"), Docket Entry No. 77; Def. Mem. in Opp'n to Pl. Mot. for Leave ("Def. Opp'n"),

Docket Entry No. 78.)  For the reasons set forth below, the Court grants Defendant's motion and

denies Plaintiff's cross-motion.  The Court also denies Plaintiff's motion to amend the Amended

Complaint.

## I.  Background

Plaintiff is a black African-American woman.[2]  (Pl. Aff. of Fact-Status, Docket Entry No.

51.)  Defendant is a not-for-profit hospital that provides inpatient, ambulatory, and preventative

care.  (Def. Statement of Material Facts Pursuant to Local Rule 56.1 ("Def. 56.1") ¶ 2, Docket

Entry No. 97.)

### a.  Plaintiff's employment

On April 11, 2011, Donna Arzberger, Defendant's Director of Perioperative Services and

Nurse Manager, hired Plaintiff as an Operating Room Technician ("ORT").  (*Id.* ¶¶ 3–4.)

Plaintiff's application for employment specified that her employment was at-will.  (*Id.* ¶ 6;

Employment Appl., annexed to Decl. of Brian G. Cesaratto ("Cesaratto Decl.") as Ex. C 5,

Docket Entry No. 86-3.)  ORTs serve as support staff during surgical procedures conducted in

operating rooms.  (Def. 56.1 ¶ 8.)  ORTs are responsible for timely reporting to their assigned

---

[1]  Plaintiff filed several additional documents in response to Defendant's motion for
summary judgment and in support of her motion for summary judgment.  (Pl. Aff. Am. for Race
and Color Misnomers along with African American, Black, Indian, Docket Entry No. 93; Pl. Aff.
for Response Affs. of Donna Arzberger and Lorraine Orlando, Docket Entry No. 94; Aff. Matter
of Proof of Claim and Designated Trustee on Account, Docket Entry No. 100.)  To the extent
that they are relevant, the Court considers these documents in deciding the motions.

[2]  Plaintiff disputes the use of the terms "African American" and "Black," and identifies
as "a Natural Person with a Nationality."  (Pl. Aff. of Fact-Status, Docket Entry No. 51.)

operating room, preparing surgical instruments and supplies needed for the surgery, and providing those tools and supplies to the surgeon during procedures. (*Id.* ¶ 9; Position Description, annexed to Cesaratto Decl. as Ex. D, Docket Entry No. 86-4.) ORTs are required to "[m]aintain[] an acceptable record of attendance" and "[m]aintain[] a consistent record of punctuality." (Def. 56.1 ¶ 11; Position Description.)

Plaintiff regularly alternated overnight shifts with another ORT, Megan Sedita. (Dep. Tr. of Pecola Cousar ("Cousar Dep."), annexed to Cesaratto Decl. 212:20–23, Docket Entry No. 86.) Plaintiff testified at her deposition that her shift ended at 7:00 AM,[3] (Cousar Dep. 212:2–6), but Defendant contends that Plaintiff was regularly assigned to work four days per week, beginning at 9:00 PM and ending at either 7:00 AM or 7:15 AM, depending on the shift, (Def. 56.1 ¶ 15; Aff. of Lorraine Orlando ("Orlando Aff.") ¶ 10, Docket Entry No. 83). Defendant maintains that it scheduled Plaintiff and Sedita "to work the extra fifteen (15) minutes in two (2) shifts each work week so that they were scheduled for 40.5 hours, and actually worked 37.5 hours after receiving a 45-minute lunch break each shift." (Def. 56.1 ¶ 16; Orlando Aff. ¶ 10.)

Defendant has an "automated time keeping system," which required Plaintiff to "punch in and out of scheduled shift times" by using her fingerprint to verify her identity. (Def. 56.1 ¶¶ 18–20; Cousar Dep. 169:6–16; Orlando Aff. ¶ 11.)

### i. Defendant's attendance policies

Defendant's vacation policy allows for seniority preference in determining "time off." Defendant hired Sedita in August of 1998 and hired Plaintiff in April of 2011, and, as a result,

---

[3] Plaintiff also testified during her deposition that at some time during the beginning of her employment, she was "told that [she] needed to clock out at 7:15" and was later told that "the schedule reflects those particular days that [she is] supposed to do 7:15." (Cousar Dep. 36:18–25.)

Sedita received preference for time off due to her seniority. (Def. 56.1 ¶ 24; Cousar Dep. 66:17–25; Orlando Aff. ¶ 37.)

Defendant's Attendance and Punctuality Policy and Sick Leave Policy allow for discipline of employees who exhibit time and attendance issues. (Def. 56.1 ¶ 22.) The Attendance and Punctuality Policy states that "a reasonable amount of absence or lateness due to bona fide personal illness, family member illness or emergency situations is to expected in any work force. However, use of these benefits must be reasonable, and habitual or excessive absence or lateness may be cause for corrective action, up to and including discharge." (Def. 56.1 ¶ 26; Orlando Aff. ¶ 12; Attendance and Punctuality Policy, annexed to Cesaratto Decl. as Ex. F, Docket Entry No. 86–6.)

The Attendance and Punctuality Policy describes excessive absenteeism as:

> (i) two (2) separate occurrences of absences within the same month for two (2) consecutive months; (ii) one (1) or more separate occurrences of absence per month within a three (3) consecutive month period; (iii) four (4) or more separate occurrences of absence in any ninety (90) day period; (iv) separate occurrences of absences that total twelve (12) per rolling twelve (12) month period; or (v) any patterned occurrences of absences which are similar and/or repetitive such as the same day each week, days taken prior to or after regular days off, holidays, vacations, paydays, scheduled days off, or on weekends and holidays when the employee is scheduled to work.

(Def 56.1 ¶ 28; Orlando Aff. ¶ 13; Attendance and Punctuality Policy.)

In addition, Defendant's Sick Leave Policy provides that "[i]f an employee is absent for three sick leave occurrences (excluding disability and workers' compensation) he/she should be counseled regarding the medical center's attendance standard of a maximum of three occurrences in any given appraisal period (12 months). An employee's failure to comply with this standard may result in disciplinary action for excessive absenteeism." (Def. 56.1 ¶ 32; Orlando Aff. ¶ 14; Sick Leave Policy, annexed to Cesaratto Decl. as Ex. G, Docket Entry No. 86–7.)

The Attendance and Punctuality Policy defines "[e]xcessively late" as "(i) two (2) occurrences of lateness within the same month; (ii) four (4) occurrences of lateness within a two (2) consecutive month period; or (iii) six (6) occurrences of lateness within a three (3) consecutive month period." (Def. 56.1 ¶ 30; Orlando Aff. ¶ 13; Attendance and Punctuality Policy.) An employee who is excessively absent or excessively late "may be subject to corrective action including but not limited to discharge." (Def. 56.1 ¶¶ 28–30; Orlando Aff. ¶ 13; Attendance and Punctuality Policy.)

In order to use sick leave due to an unforeseen illness or injury, employees must notify their department head or supervisor "at least one (1) hour prior to the beginning of their scheduled shift." (Def. 56.1 ¶ 34; Orlando Aff. ¶ 14; Sick Leave Policy.) An employee is subject to loss of pay or disciplinary measures if an employee fails to notify the department head or supervisor of an absence before the scheduled shift. (Def. 56.1 ¶ 36; Orlando Aff. ¶ 14; Sick Leave Policy.) Plaintiff admits that she was aware of Defendant's Sick Leave Policy. (Def. 56.1 ¶ 33; Cousar Dep. 164:14–25; Sick Leave Policy.)

### ii. Plaintiff's attendance and disciplinary record

In 2012, Plaintiff was counseled for excessive sick time because she was absent from work on seven occasions within a six-month period. (Def. 56.1 ¶ 37; Cousar Dep. 160:11–22; 164:4–25; Orlando Aff. ¶ 16; R. of Counseling/Discussion, annexed to Cesarratto Decl. as Ex. H, Docket Entry No. 86-8.) Arzberger told Plaintiff to "[w]atch her sick time" because of the Defendant's Sick Leave Policy. (Cousar Dep. 164:4–25.)

In June of 2013, Plaintiff called her Charge Nurse an "idiot," which resulted in a two-day suspension for insubordination. (Def. 56.1 ¶¶ 39–41; Orlando Aff. ¶ 16; June 2013 R. of Incident and Corrective Action, annexed to Cesarratto Decl. as Ex. I, Docket Entry No. 86-9.)

The suspension was later reduced to verbal counseling. (Def. 56.1 ¶ 41; Cousar Dep. 105:25–106:5, 172:11–19; June 2013 R. of Incident and Correction Action; June 2013 R. of Offense and Warning, annexed to Cesarratto Decl. as Ex. J, Docket Entry No. 86-10.)

On March 27, 2014, Plaintiff did not advise her manager that Defendant's Workforce and Health and Safety Department had cleared her to return to work on March 28, 2014, (Def. 56.1 ¶ 42; Orlando Aff. ¶ 18; Mar. 2014 R. of Counseling/Discussion, annexed to Cesaratto Decl. as Ex. K, Docket Entry No. 86–11), and, as a result, Defendant arranged coverage for Plaintiff's March 28, 2014 shift and, on April 2, 2014, issued Plaintiff verbal counseling due to her absence. (Def. 56.1 ¶¶ 43–44; Orlando Aff. ¶ 18; Mar. 2014 R. of Counseling/Discussion.)

On April 19, 2014, Plaintiff was absent from her shift because she was sick. (Def. 56.1 ¶ 45; Orlando Aff. ¶ 19; Employee Work Schedule, annexed to Cesaratto Decl. as Ex. X, Docket Entry No. 86-24.) On April 20, 2014, Plaintiff was again absent from her shift and did not notify her department in advance that she would not be working that day. (Def. 56.1 ¶ 46; Cousar Dep. 237:10–238:5; Orlando Aff. ¶ 19; Employee Work Schedule; *see also* Sick Leave Policy.) Plaintiff received a "Record of Incident and Correction Action" and a one-day suspension for the "no call/no show" on April 20, 2014. (Def. 56.1 ¶ 48; Cousar Dep. 240:7–25; Orlando Aff. ¶ 20; Apr. 2014 Record of Incident and Corrective Action, annexed to Cesaratto Decl. as Ex. L, Docket Entry No. 86-12.)

From April 30, 2014 to May 3, 2014 and from May 22, 2014 to May 24, 2014, Plaintiff was absent from work due sickness and did not report for her scheduled shifts. (Def. 56.1 ¶¶ 47, 49; Orlando Aff. ¶¶ 19, 21; Employee Work Schedule.)

On May 29, 2014, because Plaintiff had taken three or more sick days in less than three months, Defendant verbally counseled Plaintiff for excessive sick time in April and May of

2014. (Def. 56.1 ¶ 50; Orlando Aff. ¶ 21; May 2014 R. of Incident and Corrective Action, annexed to Cesaratto Decl. as Ex. M, Docket Entry No. 86-13; *see also* Sick Leave Policy.)

On December 4, 2014, Plaintiff was counseled for "disrespect of authority" and was "instructed to act in a professional manner when speaking to her supervisors and managers."[4] (Def. 56.1 ¶¶ 51–52; Orlando Aff. ¶ 22; Dec. 2014 Record of Counseling/Discussion, annexed to Cesaratto Decl. as Ex. N, Docket Entry No. 86-14.)

On January 9, 2015, Plaintiff arrived one minute late for her 9:00 PM shift, and, on January 16, 2015, Plaintiff was a "no call/no show" for her 9:00 PM shift. (Def. 56.1 ¶¶ 53–54; Orlando Aff. ¶ 23; Employee Work Schedule; Feb. 2015 R. of Incident and Corrective Action, annexed to Cesaratto Decl. as Ex. O, Docket Entry No. 86-15.)

On January 16, 2015, Plaintiff's nighttime supervisor called Plaintiff to ask her why she was absent from work that day and "Plaintiff answered the phone, asked what day it was, said she was sleeping and would call back when she awoke." (Def. 56.1 ¶ 55; Cousar Dep. 278:16–282:12; Feb. 2015 R. of Incident and Corrective Action.)

On February 11, 2015, Plaintiff arrived at 9:12 PM for her 9:00 PM shift. (Def. 56.1 ¶ 56; Orlando Aff. ¶ 24; Employee Work Schedule; Cousar Timecard, annexed to Cesaratto Decl. as Ex. Z, Docket Entry No. 86-26.)

On February 25, 2015, Plaintiff received a "Final Written Warning" for her absence on January 16, 2015 and for her failure to notify the department of her absence in advance. (Def. 56.1 ¶ 57; Orlando Aff. ¶ 24; Feb. 2015 R. of Incident and Corrective Action.)

On March 7 and March 8, 2015, Plaintiff arrived to work at 7:14 PM and 7:08 PM,

---

[4] A Record of Counseling Memo submitted by Defendant indicates that Plaintiff was instructed to act in a professional manner when speaking to her supervisors/managers, and Plaintiff stated she was not being disrespectful. (Dec. 2014 R. of Counseling Discussion.)

respectively, for her scheduled 7:00 PM shift. (Def. 56.1 ¶ 58–59; Orlando Aff. ¶ 25; Employee Work Schedule; Cousar Timecard.)

On March 10, 2015, Plaintiff was an hour and ten minutes late for her scheduled 9:00 PM shift. (Def. 56.1 ¶ 60; Orlando Aff. ¶ 25; Employee Work Schedule; Cousar Timecard.) On March 18, 2015, because of Plaintiff's excessive lateness under Defendant's Attendance and Punctuality Policy, Defendant issued to Plaintiff a "Final Written Warning." (Def. 56.1 ¶¶ 61–62; Orlando Aff. ¶ 25; Mar. 2015 Record of Incident and Corrective Action, annexed to Cesaratto Decl. as Ex. P, Docket Entry No. 86-16; Attendance and Punctuality Policy.)

On March 11, 26, and 27, 2015, Plaintiff clocked out at 7:04 AM, 7:04 AM, and 7:03 AM, respectively, before the 7:15 AM scheduled end times of her shifts. (Def. 56.1 ¶¶ 63–65; Orlando Aff. ¶ 26; Employee Work Schedule; Cousar Schedule, annexed to Cesaratto Decl. as Ex. Y, Docket Entry No. 86-25; Cousar Timecard.) On April 28, 2015, Plaintiff received a Record of Incident and Corrective Action and a one-day suspension for arriving late to work or leaving work early several times in the span of one month — on March 7, 8, 10, 11, 26, and 27, 2015.[5] (Def. 56.1 ¶ 66; Cousar Dep. 303:24–304:6; Orlando Aff. ¶ 27; Apr. 2015 Record of Incident and Corrective Action, annexed to Cesaratto Decl. as Ex. Q, Docket Entry No. 86-17.) That same day, Arzberger told Plaintiff that she needed to wait until 7:15 AM to clock out for certain shifts. (Def. 56.1 ¶ 67; Cousar Dep. 316:7–12.)

Plaintiff requested time off during Mother's Day weekend in 2015, May 8, 2015 to May 10, 2015. (Def. 56.1 ¶ 90; Cousar Dep. 253:7–11; Orlando Aff. ¶ 37.) Plaintiff made the request for time off in November of 2014. (Cousar Dep. 253:7–11.) Defendant granted Plaintiff's

---

[5] During her deposition, Plaintiff testified that some of the dates were not accurate but could not verify which dates were inaccurate because she did not have her schedule. (Cousar Dep. 304:7–21.)

requests to take May 8th and 9th off, but denied Plaintiff time off for May 10th because her co-worker Sedita requested to take that shift off. (Def. 56.1 ¶ 92; Cousar Dep. 253:12–16; Orlando Aff. ¶ 37; Hopkins Email, annexed to Cesaratto Decl. as Ex. W, Docket Entry No. 86-23.) Plaintiff alleges that Defendant's decision to deny her time off on May 10, 2015 was due to discriminatory treatment because, although Defendant's seniority policies apply to vacation days, they do not apply to "regular days off." (Cousar Dep. 253:17–21; Pl. Resp. ¶ 14.)

On May 21, 22, 27, and 28, 2015, Plaintiff clocked out before 7:15 AM; Defendant contends that Plaintiff's shift ended at 7:15 AM on these dates. (Def. 56.1 ¶¶ 68–71; Orlando Aff. ¶ 28; Employee Work Schedule; Cousar Schedule; Cousar Timecard.) Plaintiff disagrees that she was required to work until 7:15 AM on those days, and alleges that Defendant forged her employment contract or agreement and that the "7:15[AM] time is a made-up construct" so that Defendant can make time and attendance an issue and terminate her employment. (Def. 56.1 ¶ 89.)

On June 3, 2015, Defendant suspended Plaintiff for three days for clocking out early. (Def. 56.1 ¶ 72; Orlando Aff. ¶ 29; June 2015 R. of Incident and Corrective Action, annexed to Cesaratto Decl. as Ex. R, Docket Entry No. 86-18.) The June 2015 Record of Incident and Corrective Action notified Plaintiff that any further incidents of lateness or leaving work early without permission would result in the termination of her employment. (Def. 56.1 ¶¶ 72–73; Cousar Dep. 319:8–320:6; Orlando Aff. ¶ 29; June 2015 R. of Incident and Corrective Action.)

On June 5, 2015, Lorraine Orlando, Defendant's Vice President of Human Resources, and Kristen Hutchinson, Defendant's Employee and Labor Relations Manager, informed Plaintiff during a telephone conversation that she was required to work until 7:15 AM "for the last two shifts of every week." (Def. 56.1 ¶ 74; Orlando Aff. ¶ 30.) During this conversation,

Plaintiff requested that Defendant confirm her schedule in writing. (Def. 56.1 ¶ 75; Orlando Aff. ¶ 30.) On June 8, 2015, Orlando emailed Plaintiff confirming that she was required to work until 7:15 AM for the last two shifts of every week. (Def. 56.1 ¶ 76; Cousar Dep. 323:23–327:23; Orlando Aff. ¶ 30; Orlando Email, annexed to Cesaratto Decl. as Ex. S, Docket Entry No. 86-19.)

On June 20, 2015, Plaintiff was eight minutes late for her scheduled 7:00 PM shift. (Def. 56.1 ¶ 77; Orlando Aff. ¶ 31; Employee Work Schedule; Cousar Schedule; Cousar Timecard.) That same day, Plaintiff clocked out thirteen minutes before 7:15 AM. (Def. 56.1 ¶ 78; Orlando Aff. ¶ 31; Employee Work Schedule; Cousar Schedule; Cousar Timecard.)

On June 25, 2015, Plaintiff clocked in thirty-one minutes late for her 9:00 PM shift. (Def. 56.1 ¶ 79; Orlando Aff. ¶ 31; Employee Work Schedule; Cousar Schedule; Cousar Timecard.)

On June 26, 2015, Arzberger, in consultation with Defendant's Human Resources ("HR") Department, decided to terminate Plaintiff's employment because of her time and attendance record. (Def. 56.1 ¶¶ 80–81; Orlando Aff. ¶ 32; June 2015 Record of Offense and Warning.)

b. **Plaintiff's injury and subsequent termination**

On June 26, 2015, the same day that Defendant decided to terminate Plaintiff's employment, Plaintiff sustained an injury to her toe during her shift; Defendant delayed Plaintiff's termination and allowed her to take a leave of absence until August 20, 2015. (Def. 56.1 ¶ 82; Orlando Aff. ¶ 33.)

On August 20, 2015, Plaintiff returned to work and met with HR; Defendant terminated Plaintiff's employment for time and attendance issues. (Def. 56.1 ¶ 83.)

### c. Plaintiff's disability and complaints of discrimination

In her initial Complaint,[6] Plaintiff alleged that Defendant "treated her less favorably in terms of her employment conditions due to her disability and related time off." (Compl. ¶ 15.) Plaintiff testified during her deposition that she was referencing her post-traumatic stress disorder ("PTSD"). (Cousar Dep. 152:5–14.)

Plaintiff alleges that her doctor stated in 2013 and 2014 that she needed to take time off due to the stress of "dealing with Plaintiff's manager." (Pl. Aff. in Resp. ¶ 88.) The "stress 'necessitated' two different letter [sic] to take time off[,]" but Defendant "disregard[ed the] documents" and "craft[ed] . . . Plaintiff's medical need as a 'mere' request for personal time off."[7] (*Id.*) At her deposition, Plaintiff testified that she did not discuss her disability with Defendant nor request an accommodation. (Def. 56.1 ¶ 88; Cousar Dep. 152:19–154:10.)

On June 5, 2014, Plaintiff emailed Defendant's Human Resources Department complaining of racial discrimination and unfair treatment by Arzberger.[8] (June 5, 2014 Email, annexed to Pl. Aff. in Resp./Rebuttal as Ex. 2, Docket Entry No. 52.) On June 23, 2014, Orlando

---

[6] Although Plaintiff filed an Amended Complaint asserting claims for retaliation and breach of contract only, it does not appear that Plaintiff intended to abandon the claims and allegations made in the initial Complaint. In view of the fact that Defendant addressed all of Plaintiff's claims, including those included only in the initial Complaint, the Court considers all of Plaintiff's claims.

[7] Plaintiff did not file copies of the letters.

[8] The record contains a partial copy of a handwritten letter, with an EEOC stamp dated June 6, 2014, in which Plaintiff states that she felt "discriminated and targeted by [Arzberger]." (June 2014 EEOC Compl., annexed to Pl. Feb. 26, 2018 Aff.) The letter includes a reference to "charge # 520-2014-02365" and lists "Orfelino Genao" as the "investigator." (*Id.*) However, there is nothing in the record to indicate when or whether Defendant received notice of this letter. The Court notes, however, that the charge number referenced in the handwritten letter is the same charge number listed on Plaintiff's April 2015 EEOC Complaint. (June 2014 EEOC Compl.; April 2015 EEOC Compl.) The partial handwritten letter does not include any allegations of retaliatory conduct.

emailed Arzberger and Levine about Plaintiff's June 5, 2014 email and stated "[w]e need to sit her down and finish this." (June 23, 2014 Email annexed to Pl. Aff. in Resp./Rebuttal as Ex. 3, Docket Entry No. 52.)

On February 11, 2015, Plaintiff filed a charge of race and disability discrimination with the EEOC. (Feb. 2015 EEOC Compl., annexed to Cesaratto Decl. as Ex. V, Docket Entry No. 86-22.) Defendant received notice of the February 2015 EEOC Complaint on February 13, 2015. (*Id.*)

On April 24, 2015, Plaintiff amended her February 2015 EEOC Complaint to add a claim for retaliation. (Apr. 2015 EEOC Compl.) Defendant received notice of the amended April 2015 EEOC Complaint on May 14, 2015. (May 14, 2015 Email, annexed to Pl. Aff. in Resp./Rebuttal as Ex. 1, Docket Entry No. 52.)

In her initial Complaint, Plaintiff alleges that "[i]n or about August of 2015, Plaintiff's foot was injured by a metal cart full of surgical instrumentation as she was setting up for a patient." (Compl. ¶ 28.) Plaintiff also alleges that she "was taken out of work by her physician as a result of the related injury and disability temporarily preventing her from performing the essential functions of her position as a Surgical Scrub Tech." (*Id.*) Plaintiff returned to work on August 20, 2015 and provided Defendant with a doctor's note indicating that Plaintiff could return to work. (*Id.* ¶ 29.) Defendant terminated Plaintiff's employment on August 20, 2015. (*Id.* ¶¶ 30–31.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

> **b. Title VII discrimination claim**

Defendant argues that Plaintiff has failed to established a *prima facie* case of race or color discrimination because "[n]o indicia of discrimination are present." (Def. Mem. 13.)

Plaintiff argues that Arzberger treated her differently than her white counter-parts because of her race and color. (*See generally* Pl. 56.1.)[9]

Title VII discrimination claims are analyzed under the three-stage, burden-shifting

---

[9] On May 5, 2018, Plaintiff filed an "Affidavit Request for Summary Judgment" and attached evidence in support, including her June 2014 Email to HR, an audio recording and unauthenticated transcription of the audio call between Plaintiff and Mercy Thomas, Plaintiff's previous supervisor, and supplemental pleadings alleging breach of contract. (Pl. Request.) In addition, over the course of this litigation, Plaintiff has filed several affidavits, some of which include documents in support of Plaintiff's claim. To the extent relevant, the Court considers these documents in addressing Defendant's motion for summary judgment and Plaintiff's motion for summary judgment.

framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016); *Littlejohn v. City of New York*, 795 F.3d 297, 307–08 (2d Cir. 2015); *see also Tillery v. N.Y. State Office of Alcoholism & Substance Abuse Servs.*, 739 F. App'x 23, 25 (2d Cir. 2018); *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (stating that Title VII and NYSHRL claims are evaluated under the *McDonnell Douglas* framework). Under the framework, a plaintiff must establish a *prima facie* case of discrimination. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). If the plaintiff meets this "minimal" burden, *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008), a "temporary presumption" of discrimination arises, and the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the challenged conduct, *Vega*, 801 F.3d at 84 (quoting *Littlejohn*, 795 F.3d at 307, 311). *See St. Mary's Honor Ctr.*, 509 U.S. at 506–07; *Ruiz*, 609 F.3d at 492. The defendant's burden "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 509). If the defendant-employer articulates such a reason, the burden shifts back to the plaintiff to show that the defendant-employer's reason was pretext for the discrimination. *Vega*, 801 F.3d at 83; *see also Tillery*, 739 F. App'x at 25 ("[T]he plaintiff must present admissible evidence . . . that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." (citing *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009))); *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010) ("[A] plaintiff need only show that the defendant was in fact motivated at

least in part by the prohibited discriminatory animus.").

### i. *Prima facie* case

To establish a *prima facie* case of employment discrimination under Title VII, a plaintiff must show that: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega*, 801 F.3d at 83 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)); *see also Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 304 (2d Cir. 2017); *Meyer v. N.Y. State Office of Mental Health*, 679 F. App'x 89, 90 (2d Cir.), *cert. denied*, 138 S. Ct. 143 (2017); *Ruiz*, 609 F.3d at 491–92.

Plaintiff identifies as black and Defendant does not dispute that she belongs to a protected class. (*See generally* Def. Mem.); s*ee also Littlejohn*, 795 F.3d at 312 (finding the plaintiff satisfied the first element by self-identifying as black). In addition, although Plaintiff received disciplinary complaints concerning time and attendance and insubordination, Defendant does not dispute that Plaintiff was qualified for her position. *See Kaboggozamusoke v. Rye Town Hilton Hotel*, 370 F. App'x 246, 248 n.1 (2d Cir. 2010) ("[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue." (alteration in original) (citation omitted)); *see also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) ("As we have repeatedly held, the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he possesses the basic skills necessary for performance of the job. As a result, especially where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." (alteration, citations, and internal quotation marks omitted)). Further, Defendant does not dispute that disciplinary actions against Plaintiff — the May 16, 2014 Record of Incident and

Corrective Action, February 25, 2015 Final Written Warning, March 18, 2015 Final Written

Warning, and June 3, 2015 Record of Incident and Corrective Action (the "corrective actions")

— and her termination are adverse employment actions.

Defendant argues, however, that the denial of Plaintiff's requested time off in May of

2015 does not constitute an adverse employment action and further argues that Plaintiff has not

shown any inference of discrimination with regard to any adverse action.  (Def. Mem. 24.)

### 1. The denial of Plaintiff's request for time off is not an adverse employment action

An "adverse employment action" is "a materially adverse change in the terms and

conditions of employment."  *Shultz*, 867 F.3d 298, 304 (2d Cir. 2017) (quoting *Galabya v. N.Y.*

*City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)); *see also Chung v. City Univ. of N.Y.*, 605 F.

App'x 20, 22 (2d Cir. 2015) ("For purposes of a Title VII discrimination claim by a person

already employed, an adverse employment action is defined in our Circuit as a materially

adverse change in the terms and conditions of employment.").  There is "no bright-line rule to

determine whether a challenged employment action is sufficiently significant to serve as the

basis for a claim of discrimination."  *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir.

2015) (citing *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437, 446 (2d Cir.

1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53

(2006)).  "Examples of materially adverse employment actions include termination of

employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a

material loss of benefits, significantly diminished material responsibilities, or other indices

unique to a particular situation."  *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)

(alteration, citation, and internal quotation marks omitted); *see, e.g.*, *Robinson v. Dibble*, 613 F.

App'x 9, 12 (2d Cir. 2015) (noting that the plaintiff's termination constituted an "adverse

16

employment action"); *Levitant v. City of N.Y. Human Res. Admin.*, 558 F. App'x 26, 29 (2d Cir. 2014) ("It is well-established that a failure to promote is an adverse employment action." (citing *Tregelia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002))); *Sanders v. N.Y.C. Human Resources Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (holding that an adverse employment action includes "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." (citations and internal quotation marks omitted)). However, conduct that is a "mere inconvenience" does not rise to the level of an adverse employment action. *Parsons v. JPMorgan Chase Bank, N.A.*, No. 16-CV-0408, 2018 WL 4861379, at *7 (E.D.N.Y. Sept. 30, 2018) (quoting *Sanders*, 361 F.3d at 755).

Courts in this Circuit have repeatedly held that denial of a plaintiff's request for time off, absent a complete prohibition, does not rise to the level of an adverse employment action. *See Drouillard v. Sprint/United Management Company*, 375 F. Supp. 3d 245, 272 (E.D.N.Y. 2019) (finding that the plaintiff's "loss of vacation days is not an adverse employment action"); *Porter v. Donahoe*, 962 F. Supp. 2d 491, 499 (E.D.N.Y. 2013) (holding that "the rejection of [the plaintiff's] requests for leave on the terms he demanded[,] either administrative, or leave without pay . . . instead of sick leave and annual leave," did not constitute adverse employment actions); *Weber v. City of New York*, 973 F. Supp. 2d 227, 252 (E.D.N.Y. 2013) (finding that the denial of time off is not an adverse employment action); *Chukwuka v. City of New York*, 795 F. Supp. 2d 256, 261 (S.D.N.Y. 2011) ("In general, the denial of vacation time does not generally rise to the level of an adverse employment action."); *Roff v. Low Surgical & Med. Supply, Inc.*, No. 03-CV-3655, 2004 WL 5544995, at *4 (E.D.N.Y. May 11, 2004) ("[T]he denial of a single vacation request, without any indication that there was an absolute prohibition against [the] plaintiff

taking any vacation time, is not a material adverse employment action." (citing *Boyd v. Presbyterian Hosp. in the City of N.Y.*, 160 F. Supp. 2d 522, 537–38 (S.D.N.Y. 2001))).

Plaintiff argues that Defendant "unnecessarily split [her] time in half to provide special treatment . . . for Sedita." (Pl. 56.1 ¶ 90.)  The record indicates that Defendant granted Plaintiff's request for time off on May 8th and May 9th but denied her request to take time off on May 10, 2015.  (Def. Mem. 24.)  Defendant's unwillingness to allow Plaintiff to also take off May 10, 2015 does not rise to the level of an adverse employment action.  *See Allen v. A.R.E.B.A. Casriel, Inc.*, No. 15-CV-9965, 2017 WL 4046127, at *13 (S.D.N.Y. Sept. 12, 2017) (finding that although the "plaintiff complains forcefully about her denied vacation and personal time off," the "denials were 'mere inconvenience[s]' that do not rise to the level of adverse employment actions" (citing *Chukwuka*, 795 F. Supp. 2d at 261)).

Accordingly, the Court considers the May 16, 2014 Record of Incident and Corrective Action, February 25, 2015 Final Written Warning, March 18, 2015 Final Written Warning, and June 3, 2015 Record of Incident and Corrective Action (the "corrective actions") and Plaintiff's termination as adverse employment actions and examines below whether there is an inference of discrimination as to any of these actions.

### 2.  Inference of discrimination

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'"  *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).  "No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination."  *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (citations omitted).

An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]," *Franchino v. Terence Cardinal Cook Health Care Center, Inc.*, 692 F. App'x 39, 41 (2d Cir. 2017) (citing *Littlejohn*, 795 F.3d at 312), or by showing that an employer treated an employee "less favorably than a similarly situated employee outside his protected group," *Toussaint v. NY Dialysis Services, Inc.*, 706 F. App'x 44, 45 (2d Cir. 2017) (quoting *Graham v. Long Island Rail Road*, 230 F.3d 34, 39 (2d Cir. 2000)). Remarks by someone other than the decision-maker "have little tendency to show that the decision-maker was motived by the discriminatory sentiment expressed in the remark." *Sloan v. United Techs. Corp.*, 596 F. App'x 35, 36 (2d Cir. 2015) (quoting *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 115 (2d Cir. 2007)). "In assessing the record to determine whether there is a genuine issue to be tried," a court is obliged to "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 87 (2d Cir. 2016) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).

There is no direct evidence to support Plaintiff's claim that the May 16, 2014 Record of Incident and Corrective Action, February 25, 2015 Final Written Warning, March 18, 2015 Final Written Warning, and June 3, 2015 Record of Incident and Corrective Action or her termination were racially motivated. To show proof of discrimination as to all adverse actions, Plaintiff relies on Arzberger's "unfair" treatment of Plaintiff and Defendant's favorable treatment of non-African-American employees.

### A. Defendant's treatment of Plaintiff versus treatment of non-African-American employees

Plaintiff contends that Arzberger treated her unfairly on the basis of her race and color. (Pl. Aff. in Resp. 4.)  In support, Plaintiff argues that Sedita received favorable treatment "because Sedita was European and Plaintiff was (at that time referred to as African American, black, colored)."  (*Id.*)

Defendant argues that it terminated Plaintiff for time and attendance issues and "[t]here is no evidence that any other ORT's had the same performance issues as Plaintiff did, and even assuming, *arguendo*, that they did, that they were treated differently than Plaintiff."  (Def. Mem. 13.)

"Mere 'conclusory allegations or unsubstantiated speculation' by the plaintiff will not defeat summary judgment." *DiGirolamo v. MetLife Grp., Inc.*, 494 F. App'x 120, 121–22 (2d Cir. 2012) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).  However, a plaintiff may raise an inference of discrimination by showing that his employer treated him less favorably than a similarly situated employee outside his protected group. *See Graham*, 230 F.3d at 39. "To raise an inference of discrimination by showing that he was subjected to disparate treatment, the plaintiff must establish that he was 'similarly situated in all material respects' to the individuals with whom he seeks to compare himself." *Diggs v. Niagara Mohawk Power Corp.*, 691 F. App'x 41, 43 (2d Cir. 2017) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).

### (1) Plaintiff has not shown any evidence of unfair treatment

There is no evidence before the Court that Arzberger treated Plaintiff unfairly because of her race, color, or national origin.  Plaintiff's only support for her allegation that Arzberger treated her unfairly is her "firsthand knowledge of how [Arzberger] has treated her" and "the

lack of consideration [Arzberger]" gave Plaintiff "versus other people." (Cousar Dep. 287:13–25.) Plaintiff does not specify any discriminatory treatment of her by Arzberger or lack of consideration by Arzberger, except as to her denial of Plaintiff's request for leave on May 10, 2015, and points to no evidence to indicate that Arzberger was doing anything other than enforcing Defendant's policy of awarding the day off to the most senior employee.[10] Nor has Plaintiff pointed to any evidence in the record showing that Arzberger ever made any derogatory comments towards her or others regarding Plaintiff's race, color, or ethnicity,[11] or called her by racial names. To the contrary, at her deposition Plaintiff specifically admitted that Arzberger never did any of these things. (Cousar Dep. 145:7–25–146:1–12.) Plaintiff's speculation and unsupported belief that Arzberger's treatment of her was racially motivated are not probative evidence and are insufficient to support any inference of discrimination. *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015) ("[E]ven if sincerely held, a plaintiff's 'feelings and perceptions of being discriminated against' do not provide a basis on which a reasonable jury can ground a verdict."); *see Rosario v. Hilton Worldwide, Inc.*, No. 09-CV-5336, 2011 WL 336394, at *3 (E.D.N.Y. Jan. 24, 2011) (finding that plaintiff's "gut feeling" did not allow for an inference of discrimination and was not sufficient to defeat a motion for summary judgment without the support of specific facts supporting the plaintiff's claim of discrimination).

---

[10] Plaintiff states that her request for time off was a "combination of personal days and vacation days" and that "Arzberger unnecessarily split Plaintiff's time in half [to] provide for special treatment" for Sedita. (Pl. Aff. in Resp. 4.) Plaintiff acknowledges that Sedita had "seniority" but argues that "favoritism and prejudice . . . exist[ed] . . . because Sedita was European and Plaintiff was" black. (*Id.*)

[11] During her deposition, Plaintiff admitted that her prior statement that "[t]he only other African-American employees with whom Plaintiff regularly worked was also fired" was a false statement and also admitted that none of Defendant's employees made comments directed at Plaintiff's accent. (Cousar Dep. 53:8–24, 136:23–137:19.)

### (2) Plaintiff has not shown that Sedita or anyone else was similarly situated to Plaintiff or that Defendant treated non-African American employees more favorably

Plaintiff also fails to present any evidence that her comparators, including Sedita, were "similarly situated in all material respects" and fails to show that Caucasian co-workers engaged in comparable conduct and were treated differently. *See Shumway*, 118 F.3d at 64 (finding that the plaintiff failed to prove that he was similarly situated after presenting no evidence of similar infractions by comparators).

In Orlando's sworn statement in support of Defendant's motion, he states that Sedita "did not have any time and attendance related issues for the years 2014 and 2015." (Def. 56.1 ¶ 86; Orlando Aff. ¶ 36.) Plaintiff does not dispute this evidence. Indeed, Plaintiff admitted during her deposition that she did not have any personal knowledge "that anybody was treated differently than [her] for not showing up for their shift on time." (Cousar Dep. 288:15–19.) As to her request to take time off on May 10, 2015, Plaintiff acknowledges that Sedita had "seniority" over her and that "[s]eniority is granted in the initial selection of vacation time for" senior personnel. (Pl. Aff. in Resp. 3–4; Cousar Dep. 69:9–70:4.)

In opposition to Defendant's argument that it took corrective actions and terminated Plaintiff because of her time and attendance issues, Plaintiff challenges Defendant's contention that she was required to work until 7:15 AM and argues that Defendant's claim is based on a forged and altered contract that changed her end of shift time to 7:15 AM rather than 7:00 AM. Plaintiff argues that her "contract [was] altered and forged," that the "7:15AM time is a made up construct," and that Defendant "tried to make attendance and performance an issue" in order to terminate Plaintiff's employment. (Pl. Aff. in Resp. 3.)

Contrary to Plaintiff's argument, Plaintiff was an "at-will" employee and had no

employment contract with Defendant.[12]  However, even assuming that Plaintiff had a "contract" that required Plaintiff to work until 7:00 AM rather than 7:15 AM, that contract was modified orally and in writing.  Arzberger "instructed Plaintiff that she needed to work until 7:15 AM for certain shifts" and Orlando confirmed via email that Plaintiff was required to work until 7:15 AM for the last two shifts of every week.  (Def. 56.1 ¶ 67; Cousar Dep. 36:18–25, 316:7–12.)  Thus, not only did Defendant communicate this work schedule to Plaintiff orally, Defendant subsequently provided Plaintiff, at her request, with written confirmation "that she was required to work until 7:15 AM, for the last two shifts of every week."  (Def. 56.1 ¶¶ 75–76; Orlando Aff. ¶ 30.)

Despite being notified of the shift hours in writing and having received a final warning that she would be terminated for any further incidents of unexcused lateness or absences, Plaintiff was eight minutes late and clocked out thirteen minutes early on June 20, 2015 and was thirty-one minutes late on June 25, 2015.  (Def. 56.1 ¶ 78; Orlando Aff. ¶ 31.)  Defendant decided to terminate Plaintiff but delayed the termination because of Plaintiff's injury that day. (Def. 56.1 ¶ 78.)  There is no evidence from which a reasonable jury could infer that discrimination played any role in the corrective actions or Plaintiff's termination.  *See Ochoa v.*

---

[12]  Plaintiff refers to a document titled "Scheduled Hours" as her employment contract. (Scheduled Hours, annexed to Aff. Request for Summ. J. as Ex. 5, Docket Entry No. 59-5.)  The Scheduled Hours form contains Plaintiff's signature and indicates Plaintiff's work hours as 9:00 PM to 7:15 AM.  (*Id.*)  Plaintiff contends that Defendant altered her work hours on the Scheduled Hours form after she had already signed it and without her consent to change her end of shift time from 7:00 PM to 7:15 PM.  (Pl. Aff. in Resp. 2 (noting the "unauthorized change of contract (yes contracts bear signatures of parties in agreement) from 9 [PM] to the 7:15 [AM] time, a time which Plaintiff did not sign nor consent").)  Upon the Court's observation of the Scheduled Hours form, the "9 PM" to "7:15 AM" shift indicated on the Scheduled Hours form appears in a shade darker than the other writing on the form.  (Scheduled Hours.)  The Scheduled Hours form also includes the signature of a witness, although the witness' name is not legible. (*Id.*)

*Fed. Express Corp.*, No. 16-CV-8729, 2018 WL 3996928, at *3 (S.D.N.Y. Aug. 21, 2018)

(finding that the plaintiff's "unsupported aspersions on the process leading to his termination,

suggesting, for example, that his manager falsely claimed that the decision to fire him came

directly from FedEx's Chief Executive Office" did not support a conclusion "that FedEx

discriminated against [the plaintiff] on the basis of race or national origin); *see also White v.*

*N.Y.C. Dep't of Educ.*, No. 05-CV-2064, 2008 WL 4507614, at *5 (E.D.N.Y. Sept. 30,

2008) ("Title VII is not a civility statute. Title VII solely addresses conduct motivated (a) by

animus towards members of protected class and (b) because of the victim's protected

characteristics; it does not reach instances of generally poor behavior, personal animosity or

even unfair treatment." (citation omitted)).

### ii. Legitimate, non-discriminatory reason

Even assuming that Plaintiff could establish a *prima facie* case of discrimination,

Defendant has proffered a legitimate, non-discriminatory reason for the corrective actions and

Plaintiff's termination. Defendant's contend that "Plaintiff's recurring time and attendance

issues despite counseling and discipline formed the sole basis for the termination of her

employment." (Def. Mem. 14–15.)

Plaintiff's excessive lateness and absenteeism serve as a legitimate, nondiscriminatory

reason for her termination. Plaintiff repeatedly arrived to work late and clocked out early. (Def.

56.1 ¶¶ 37–79.) On March 18, 2015, Plaintiff received a "Final Written Warning due to her

lateness on January 9, 2015; February 11, 2015; March 7, 2015; March 8, 2015; and March 10,

2015."[13] (Def. 56.1 ¶ 61.) On April 28, 2015, Plaintiff "received a Record of Incident and

_____

[13] Plaintiff was only one minute late on January 9, 2015, but was twelve minutes late on
February 11, 2015, fourteen minutes late on March 7, 2015, seven minutes late on March 8,

Corrective Action and was suspended for one (1) day for six (6) episodes of coming in to her shift late or leaving her shift early within one (l) month on March 7, 2015, March 8, 2015, March 10, 2015, March 1l, 2015, March 26, 2015 and March 27, 2015." (Def. 56.1 ¶ 66; Cousar Dep. 303:24–304:6; Orlando Aff. ¶ 27.) Plaintiff subsequently arrived late to work or left work early. On June 3, 2015, Plaintiff "received a Record of Incident and Corrective Action and was suspended for three (3) days for leaving the work area and punching out before the end of her shifts in May [of] 2015." (Def. 56.1 ¶ 72; Orlando Aff. ¶ 29.) Plaintiff was also notified that her June 3, 2015 discpline served as a final warning that "any additional incidents of arriving to her shift late or leaving her shift early without permission would result in the termination of her employment." (Def. 56.1 ¶ 73.) Despite the final warning and Plaintiff's knowledge that she was required to work until 7:15 AM for the last two shifts of every week, (*id.* ¶¶ 74–76), Plaintiff clocked in after 9:00 PM and clocked out before 7:15 AM during her shift on June 20, 2015, and arrived late for her 9:00 PM shift on June 25, 2015, (*id*. ¶¶ 78–79). In light of Plaintiff's time and attendance issues, and failure to correct her behavior despite several counseling sessions, Defendant had a legitimate reason to terminate her employment. *See Colon v. Fashion Inst. of Tech. (State Univ. of N.Y.)*, 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (finding that tardiness and absence is a sufficient nondiscriminatory reason for termination).

### iii.   Plaintiff has not established pretext

Because Defendant has shown a legitimate reason for Plaintiff's corrective actions and her termination, unless Plaintiff can show that Defendant's articulated reasons are pretext for discrimination, Defendant is entitled to summary judgment on Plaintiff's Title VII discrimination

---

2015, and one hour and ten minutes late on March 10, 2015. (Mar. 17, 2015 Record of Incident and Corrective Action; Time Detail.)

claim. *See Spiegel v. Schulman*, 604 F.3d 72, 80 (2d Cir. 2010) (explaining that if the defendant proffers a nondiscriminatory reason, the defendant is entitled to summary judgment unless the plaintiff can show pretext).

A plaintiff may show pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, [nondiscriminatory] reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)); *see also Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."); *Doe v. Bd. of Educ. of Fallsburgh Cent. Sch. Dist.*, 63 F. App'x 46, 49–50 (2d Cir. 2003) ("Evidence that could permit a jury to believe that the defendant's proffered reasons are not believable can support an inference that they are pretexts for discrimination."); *Pediford–Aziz v. City of New York*, 170 F. Supp. 3d 480, 486 (E.D.N.Y. 2016) ("From . . . implausibilities, inconsistencies, and contradictions in the proffered reasons . . . one could conclude that . . . explanations [are] pretext." (alterations, citation, and internal quotation marks omitted)).

When making this assessment, courts "are decidedly not interested in the truth of the allegations against [the] plaintiff" but rather "are interested in what motivated the employer." *Toussaint*, 706 F. App'x at 45–46 (quoting *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006)); *see also Eisner v. Cardozo*, 684 F. App'x 29, 31 (2d Cir. 2017) (noting that the pretext inquiry is "decidedly not interested in the truth of the allegations against [a plaintiff, but only] in what motivated the employer" (quoting *McPherson*, 457 F.3d at 216)); *Graham*, 230

F.3d at 44 (holding that the plaintiff could not establish pretext by demonstrating that the results of a failed drug test were not "actually correct" because "[t]he key question is whether it was reasonable for the employer to rely on the test result in making its employment decision"); *Hartley v. Rubio*, 785 F. Supp. 2d 165, 177 (S.D.N.Y. 2011) ("In determining whether the articulated reason for the action is a pretext, 'a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable. Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action.'" (quoting *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993))); *Koleskinow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009) ("Where a plaintiff has been terminated for misconduct, the question is not whether the employer reached a correct conclusion in attributing fault [to the plaintiff] . . . , but whether the employer made a good-faith business determination." (internal quotation marks omitted)); *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 187–88 (E.D.N.Y. 2008) ("[T]he fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.").

The evidence before the Court is that Defendant issued Plaintiff corrective actions that ultimately culminated in Plaintiff's termination due to time and attendance issues. Even if the Court were to accept Plaintiff's suggestion that Defendant's "forged" the "employment contract" and changed her end of shift time from 7:00 AM to 7:15 AM, Plaintiff does not dispute the other recorded instances in which she was either absent or late for her shift. Even after being disciplined and provided with a final warning as to her time and attendance issues, Plaintiff

arrived late to her shift on June 25, 2015. (Def. 56.1 ¶¶ 59–60.) Defendant's proffered reason for the corrective actions against Plaintiff and her termination are not pretext, because Plaintiff failed to comply with Defendant's policies, even accepting Plaintiff's argument that she was only required to work until 7:00 AM. *See Ejiogu v. Grand Manor Nursing and Rehabilitation Ctr.*, No. 15-CV-505, 2017 WL 1184278, at *11 (S.D.N.Y. Mar. 29, 2017) (finding that the defendant's proffered reason of job abandonment was not pretext because the plaintiff "received repeated notices from . . . superiors that [the plaintiff] was expected to return to work" but failed to do so); *Brown v. The Pension Boards*, 488 F. Supp. 2d 395, 406 (S.D.N.Y. 2007) (finding that the defendant's proffered reason for the plaintiff's termination was not pretext because the plaintiff's "actions provided a reasonable basis to terminate his employment" (citation omitted)).

The Court therefore grants Defendant's motion for summary judgment as to Plaintiff's Title VII discrimination claim.

    **c.   Title VII retaliation claim**

Defendant argues that Plaintiff's allegations and purported evidence do not establish a *prima facie* case of retaliation and that the record demonstrates that Defendant disciplined Plaintiff and terminated her employment for time and attendance issues. (Def. Mem. 16–17.)

Plaintiff argues that Defendant retaliated against her for complaining of discrimination to Defendant's Human Resources Department in 2014. (Pl. Aff. in Resp. 3.) The Court construes Plaintiff's allegations as also raising a claim that Defendant retaliated against her for the February 2015 EEOC Complaint, by issuing the February 25, 2015 Final Written Warning and terminating her employment.

Title VII retaliation claims are also "evaluate[d] . . . using the three-step framework outlined in *McDonnell Douglas*." *Russell v. N.Y. Univ.*, 739 F. App'x 28, 32 (2d Cir. 2018)

(citing *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018)). Under the framework, the plaintiff must first establish "a *prima facie* case of retaliation." *Id.* (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)). If the plaintiff sustains this initial "*de miminis*" burden, *Duplan*, 888 F.3d at 626, a "presumption of retaliation" arises and the defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action," *Saji*, 724 F. App'x at 14 (quoting *Hicks*, 593 F.3d at 164). "If the defendant does so, then the burden shifts back to the plaintiff . . . [to] show that the reason offered by the employer is merely pretext, and that the employer's 'desire to retaliate' was the actual 'but-for cause of the challenged employment action.'" *Id.* (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015)). "'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Duplan*, 888 F.3d at 625 (quoting *Vega*, 801 F.3d at 90–91).

### i. *Prima facie* case

To establish a *prima facie* case of retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

Defendant concedes that the corrective actions against Plaintiff and her termination are adverse actions but argues that there "is no record evidence to establish the first, second, and fourth elements of Plaintiff's *prima facie* case of retaliation." (Def. Mem. 17.)

Plaintiff argues that "Defendant[] retaliated . . . by forgery for [sic] an employment agreement and/or contract without Plaintiff's consent . . . ." (Pl. Aff. in Resp. 3.) In addition,

Plaintiff argues that Defendant retaliated against her for filing a discrimination complaint with HR by terminating her employment. (*Id.*)

### 1. Protected activity and Defendant's knowledge

Filing either a formal or informal complaint challenging discrimination is a protected activity for purposes of retaliation claims under Title VII. *See Jagmohan v. Long Island R. Co.*, 622 F. App'x 61, 63 (2d Cir. 2015); *Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013). "A complaint of discrimination constitutes 'protected activity' only if (1) the plaintiff holds a good-faith belief that he suffered discrimination because of a protected characteristic and (2) that belief is reasonable." *Jagmohan*, 622 F. App'x at 64–65 (citing *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)); *Summa*, 708 F.3d at 126 (holding that Title VII "protects employees [who] . . . make[] informal protests of discrimination, including making complaints to management, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law" (alterations in original) (quoting *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001))).

In June of 2014, Plaintiff complained to HR about Arzberger's unfair treatment, which Plaintiff communicated to Defendant was based on Plaintiff's race. (June 2014 Email.)

In February of 2015, Plaintiff filed a complaint with the EEOC alleging race and disability discrimination, and Defendant received notice of Plaintiff's EEOC charge on February 11, 2015. (Def. Mem. 18 n.20; February 2015 EEOC Compl.)

Plaintiff amended her February 2015 EEOC Complaint on April 24, 2015, to raise a claim of retaliation. (April 2015 EEOC Compl.) Although it is unclear when Defendant received notice, Defendant does not contest that it received notice of the April 2015 EEOC Complaint. (*See* Email from EEOC Staff Mediator David L. Reinman dated May 14, 2015,

annexed to Pl. Aff. in Resp./Rebuttal, Docket Entry No. 52.)

Plaintiff's June 2014 Email, February 2015 EEOC Complaint, and April 2015 EEOC Complaint constitute protected activity for purposes of Plaintiff's Title VII retaliation claim.

### 2. Causal connection

Defendant argues that Plaintiff fails to show an inference of retaliation because Defendant's discipline "began before she raised a complaint of discrimination." (Def. Mem. 18.)

Construing Plaintiff's allegations to raise the strongest argument they suggest, Plaintiff appears to rely on temporal proximity between her protected activity and adverse employment actions. (*See* Feb. 2015 EEOC Compl. ("Respondent received EEOC' Notice of my Charge. Shortly thereafter, Respondent retaliated against me on [February 25, 2015], when I was issued a final written warning for a time and attendance issue that occurred on [January 16, 2015].").)

A causal connection between the protected activity and the adverse action can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory actions directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 307, 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). "Direct evidence may . . . include evidence of discriminatory statements or actions by employees who, while not the ultimate decisionmakers, have 'enormous influence in the decision-making process.'" *Emmanuel v. Cushman & Wakefield, Inc.*, No. 13-CV-2894, 2015 WL 5036970, at *4 (S.D.N.Y. Aug. 26, 2015) (quoting *Rose v. N.Y.C. Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001)). Indirect evidence may include a "showing that the protected activity was closely followed in time by the adverse action." *Colon v. Fashion Inst. of Tech.*, 983 F. Supp. 2d 277,

287 (S.D.N.Y. 2013) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)); *see also, e.g.*, *Feingold v. New York*, 366 F.3d 138, 156–57 (2d Cir. 2004) ("[T]he requirement that [the plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two." (collecting cases)); *Nonnenmann v. City of New York*, No. 02-CV-10131, 2004 WL 1119648, at *22 (S.D.N.Y. May 20, 2004) ("Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999))).

However, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Chung v. City Univ. of New York*, 605 F. App'x 20, 23 (2d Cir. 2015) (quoting *Slattery*, 248 F.3d at 95); *see also Lue v. JPMorgan Chase & Co.*, 768 F. App'x 7, 10–11 (2d Cir. 2019) (affirming the district court's grant of summary judgment as to the plaintiff's Title VII retaliation claim where the record showed that "defendants' criticisms of [the plaintiff's] communication style and her response to feedback predated her complaints of discrimination" and there was no other "evidence of an intent to retaliate"); *Martinez v. Davis Polk & Wardwell*, 713 F. App'x 53, 57 (2d Cir. 2017) (finding that the plaintiff failed to show an inference of retaliation under Title VII where the plaintiff "began receiving performance reviews that noted her struggles with time and project management as early as . . . three years before [the plaintiffs] filing of the EEOC charges" because "[u]nder these circumstances, a reasonable jury could not conclude that [the defendant's] treatment of [the plaintiff] in the wake of her EEOC filing . . . was retaliatory as opposed to the culmination of 'gradual adverse job actions' that

began *three years prior* to the alleged retaliatory event" ); *Elliot-Leach v. N.Y.C. Dept. of Educ.*, 710 F. App'x 449, 452 (2d Cir. 2017) ("Because [the plaintiff] had been disciplined for work absences before she requested FMLA leave, and because she relies only on temporal proximity to suggest retaliatory intent, her retaliation claim fails."); *Sotomayor v. N.Y.C.*, 713 F.3d 163, 164 (2d Cir. 2013) (finding no *prima facie* case of FMLA retaliation where the plaintiff began receiving negative evaluations in her disciplinary file before her application for FMLA leave); *Powell v. Merrick Academy Charter Sch.*, No. 16-CV-5315, 2018 WL 1135551, at *10 (E.D.N.Y. Feb. 28, 2018) (finding no inference of retaliation where the complaint made "extensive allegations that both (1) suggest an obvious alternative explanation for the decision to fire her and (2) make clear that Plaintiff was subject to disciplinary action and demonstrably at risk of losing her job before she engaged in any identifiable protected activity"); *Catanzaro v. City of New York*, No. 10-CV-1825, 2011 WL 335648, at *7 (S.D.N.Y. Jan. 25, 2011) (finding that the plaintiff cannot rely solely on temporal proximity to raise inference of retaliation where he was "demonstrably at risk" of adverse action prior to engaging in the protected activity).

Defendant acknowledges that it received Plaintiff's February 2015 EEOC Complaint on February 11, 2015, (Def. Mem. 18 n.20), issued Plaintiff a Final Written Warning on February 25, 2015 because of her absence from work on January 16, 2015, and a Final Written Warning on March 18, 2015. Thus, there is temporal proximity between Plaintiff's February 2015 EEOC Complaint and the February of 2015 and March of 2015 Final Written Warnings.[14]

---

[14] While Plaintiff's June 2014 Email to HR constitutes protected activity, there is no adverse action that followed close in time to the protected activity. The closest adverse action occurred in February of 2015. (*See* Feb. 2015 Final Written Warning.) The approximately eight-month gap between the June of 2014 protected activity and the February 2015 Final Written Warning, without more, does not allow for an inference of retaliation. *See Tuccio Dev., Inc. v. Miller*, 423 F. App'x 26, 28 (2d Cir. 2011) (finding two-month gap between protected activity and alleged adverse action was too distant to indirectly support retaliatory motive where

However, because Defendant began disciplining Plaintiff for time and attendance issues in 2012, approximately two years before Plaintiff filed her first complaint of discrimination with HR in June of 2014, Plaintiff cannot rely on temporal proximity alone to establish an inference of retaliation.  In October of 2012, Plaintiff was disciplined for excessive sick time.  (Def. 56.1 ¶ 38; Orlando Aff. ¶ 16.)  On April 2, 2014, Plaintiff was verbally counseled for being absent from her shift on March 28, 2014.  (Orlando Aff. ¶ 18.)  In addition, on May 16, 2014, Plaintiff received a "Record of Incident and Corrective Action" and a one (1) day suspension for being a "no call/no show" for her absence from work on April 20, 2014.  (Def. 56.1 ¶ 48; Cousar Dep. 240:7–25.)  On May 29, 2014, Defendant verbally counseled Plaintiff for excessive sick time from April 30, 2014 to May 3, 2014.  (Def. 56.1 ¶ 50.)  Because all of these time and attendance corrective actions took place prior to Plaintiff engaging in *any* protected activity — the June 2014 Email to HR alleging discrimination — Plaintiff has not shown any inference of retaliation in connection with the February of 2015 Final Warning or March of 2015 Final Written Warning.

Further, Plaintiff fails to demonstrate an inference of retaliation as to her termination because her termination was the product of corrective actions against her for time and attendance issues that began before Plaintiff filed her February of 2015 EEOC Complaint.  *See Slattery*, 248 F.3d at 95 (holding that the plaintiff failed to demonstrate a *prima facie* case of retaliation where there was a close temporal proximity between the complaint and adverse employment action but "the adverse employment actions were both part, and the ultimate product, of 'an extensive period of progressive discipline' which began when [the defendant] diminished [the plaintiff's]

---

no additional causation evidence was introduced); *Dechberry v. N.Y.C. Fire Dep't*, 124 F. Supp. 3d 131, 153–55 (E.D.N.Y. 2015) (finding six-month gap too attenuated).

job responsibilities a full five months prior to his filing of the EEOC charges"); *Spadola v. N.Y.C. Transit Auth.*, 242 F. Supp. 2d 284, 294–95 (S.D.N.Y. 2003) (stating that an employer is "not obligated to automatically cease or abandon an ongoing internal disciplinary procedure merely because an employee files a charge alleging discrimination").

Moreover, even if Plaintiff could establish a *prima facie* case of retaliation, Plaintiff's claim nevertheless fails at the pretext stage because there is no evidence rebutting Defendant's legitimate business reasons for her termination — Plaintiff's time and attendance issues and the progressive discipline related thereto — and Plaintiff cannot rely on temporal proximity alone to demonstrate retaliatory animus. *See Borzon v. Green*, 2019 WL 2754960, --- F. App'x ---, --- (2d Cir. July 2, 2019) (finding that the temporary proximity between the plaintiff's termination and "his lodging of the complaint, without more, cannot sustain" a finding of retaliatory animus).

The Court therefore grants Defendant's summary judgment motion as to Plaintiff's Title VII retaliation claim.

### d. Title VII hostile work environment claim

Construing Plaintiff's allegations liberally, the Court evaluates whether there is any evidence that Arzberger's treatment of Plaintiff created a hostile work environment.

Defendant argues that there "is absolutely no record evidence" to support a hostile work environment claim. (Def. Mem. 23.)

"[T]o establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that 'the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Tillery*, 739 F. App'x at 27 (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir.

2010)); *see also Boonmalert v. City of New York*, 721 F. App'x 29, 33 (2d Cir. 2018) (holding conduct must be both objectively severe or pervasive and subjectively perceived to be abusive). Under the totality of the circumstances, a plaintiff must show "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)) (internal quotation marks omitted); *Littlejohn*, 795 F.3d at 321 ("[W]e must consider . . . 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993))). "A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." *Tillery*, 739 F. App'x at 27 (quoting *Brennan v. Metro Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999)).

Plaintiff alleges that she was subject to a hostile work environment but provides neither specific factual allegations nor any evidence to support a hostile work environment claim.[15] Nevertheless, construing Plaintiff's challenges to her repeated discipline for time and attendance issues as the basis for her hostile work environment claim, the claim fails because Plaintiff does not provide any evidence that the corrective actions were objectively severe or pervasive, or that she was subject to discipline because of her race, color, ethnicity or her membership in any other protected class. As discussed above, there is no evidence to show that the corrective actions

---

[15] Plaintiff alleges that she was "subject to a hostile work environment that was categorized by persistent outrageous and baseless allegations of misconduct, not merely once or twice but repeatedly." (Compl. ¶ 37.) Plaintiff, however, has not produced any evidence of the "outrageous and baseless allegations of misconduct" alleged in her original Complaint.

taken over the span of Plaintiff's employment were due to race or color but rather as a result of Plaintiff's failure to comply with, *inter alia*, Defendant's Time and Attendance Policy and Sick Leave Policy. *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 75 (2d Cir. 2019) ("Legitimate reprimands by an employer are not abuse."). Viewing all the evidence in the light most favorable to Plaintiff, and considering the totality of the circumstances, the Court finds that no reasonable juror would perceive Plaintiff's workplace to be permeated with discriminatorily-motivated actions that were sufficiently severe or pervasive to alter the conditions of her work environment. *See Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018) (finding that the plaintiff's allegations that he was retaliated against for making two complaints was suspended without pay for ten days were insufficient to meet the "high bar" required to state a claim for a hostile work environment); *Harrison*, 2018 WL 4055278, at *11–12 (dismissing hostile work environment claims where the plaintiff "complain[ed] of five extremely unpleasant interactions" and uncertainty about requested sick leave "over the course of several weeks"); *Johnson v. Conn. Dep't of Admin. Servs. Bureau of Enter. Sys. & Tech.*, No. 17-CV-901, 2018 WL 306697, at *8 (D. Conn. Jan. 5, 2018) (finding that the plaintiff's allegations that a defendant "cited [the] plaintiff for an unauthorized absence, gave him a negative evaluation, and denied him mentoring," did not "rise to the level of severe or pervasive and cannot be said to have altered the conditions of [the] plaintiff's employment for the worse"); *Guy v. MTA N.Y.C. Transit*, No. 15-CV-2017, 2016 WL 8711080, at *8 (E.D.N.Y. Sept. 23, 2016) (dismissing hostile work environment claims where the plaintiff "simply identifies a series of incidents in his complaint," but "fails to allege any facts that would show that the conduct of which he complains is objectively severe and pervasive").

Accordingly, the Court grants Defendant's motion for summary judgment as to Plaintiff's

hostile work environment claim.

      **e.   ADA claim**

      Plaintiff appears to argue that she had a disability and Defendant either failed to

accommodate her disability or unlawfully terminated her employment because of her disability.

      Defendant does not dispute that it is subject to the ADA, that Plaintiff was qualified to

perform the essential functions of the job with or without reasonable accommodation, or that

Plaintiff's termination was an adverse employment action. (Def. Mem. 20–22.) Defendant

argues that because Plaintiff explicitly did not inform it of her disability, and because her foot

injury is not a disability under the ADA, Plaintiff fails to establish an ADA claim. (*Id*. at 22.)

      Claims of employment discrimination under the ADA are assessed using the burden-

shifting framework established by the Supreme Court in *McDonnell Douglas Corp.*, 411 U.S.

792. *See Sista*, 445 F.3d at 169. Under the framework, a plaintiff must first establish a *prima*

*facie* case of discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 506; *see also Ruiz*, 609 F.3d at

491. A plaintiff's burden at this stage is "minimal," *Holcomb*, 521 F.3d at 139 (quoting *Hicks*,

509 U.S. at 506). If the plaintiff satisfies this initial burden, the burden then shifts to the

defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at

506–07; *Ruiz*, 609 F.3d at 492. The defendant's burden "is not a particularly steep hurdle."

*Hyek v. Field Support Servs.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010), *aff'd*, 461 F. App'x 59

(2d Cir. 2012). It "is one of production, not persuasion; it 'can involve no credibility

assessment.'" *Reeves*, 530 U.S. at 142 (quoting *Hicks*, 509 U.S. at 509). If the defendant offers

a legitimate, nondiscriminatory explanation for its action, the court must nevertheless deny

summary judgment if the plaintiff can show that the explanation was pretext.

      To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show

that "(1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015).

There is no evidence in the record from which a reasonable jury could infer that Defendant had notice that Plaintiff suffered from any disability. A plaintiff must "adduce evidence raising a material issue of fact regarding [the] defendant's knowledge of her disability." *Volmar v. Cold Spring Hills Ctr. for Nursing & Rehab.*, 395 F. App'x 795, 796 (2d Cir. 2010). "The notice requirement is rooted in common sense. Obviously, an employer who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability." *Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (quoting *Felix v. N.Y.C. Transit Auth.*, 154 F. Supp. 2d 640, 657 (S.D.N.Y. 2001)); *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003) (noting the impossibility of an employer basing an adverse employment decision on disability if it were "truly unaware that such a disability existed"); *McCoy v. Morningside at Home*, No. 11-CV-2575, 2014 WL 737364, at *4 (S.D.N.Y. Feb. 25, 2014) ("[C]ausation [ ] necessarily incorporates an inquiry as to whether the employer had notice of the plaintiff's disability."), *aff'd*, 601 F. App'x 57 (2d Cir. 2015).

Plaintiff testified during her deposition that she suffered from PTSD, but admitted that she did not tell Arzberger or anyone in HR about her PTSD because she was "not required to divulge [her] disability." (Cousar Dep. 152:19–21, 153:6–12.) When asked whether Plaintiff needed "any assistance in doing [her] job," Plaintiff testified "absolutely not." (Cousar Dep.

153:13–17.) Plaintiff argues that because Defendant possessed Plaintiff's "DD Form 214,"[16] —

which according to Plaintiff, notified Defendant that Plaintiff is a war veteran — Defendant was

on notice that she suffered from a disability. However, Defendant's knowledge that Plaintiff is a

war veteran is insufficient to put Defendant on notice that Plaintiff suffers from a disability.[17]

See McCoy, 2014 WL 737364, at *4 ("An employer's awareness that a plaintiff suffered some

injury does not establish that an employer had notice that the plaintiff was disabled.").

Because there is no evidence in the record to suggest that Plaintiff informed Defendant of

any disability, much less that Defendant terminated Plaintiff because of any disability, the Court

grants Defendant's motion for summary judgment as to Plaintiff's ADA discrimination claim.[18]

---

[16] There is no information in the record as to the contents of "DD Form 214." Plaintiff only alleges that Defendant "maintained a copy" of the form, "no doubt for 'hiring benefits' for Veterans." (Pl. Aff. in Resp. 3.)

[17] As to Plaintiff's foot injury on June 26, 2015, Plaintiff has not shown that it rendered her disabled. Plaintiff alleges that her "foot was injured by a metal cart full of surgical instrumentation as she was setting up for a patient." (Compl. ¶ 28.) A letter from Dr. Idit R. Forkosh dated June 29, 2015, indicates that Plaintiff was being treated for "a contusion of the right foot." (Letter from Dr. Forkosh dated June 29, 2015, annexed to Pl. Aff. in Resp./Rebuttal as Ex. 3, Docket Entry No. 52.) Plaintiff "advised she would be out of work for a period of time" and returned on August 20, 2015. (Orlando Aff. ¶ 33.) Construing Plaintiff's allegations about her foot injury on June 26, 2015 to raise an ADA discrimination claim, there is insufficient evidence in the record from which a jury could draw any inference that her foot injury rendered her disabled. See Kruger v. Hamilton Manor Nursing Home, 10 F. Supp. 3d 385, 388 (W.D.N.Y. 2014) ("[B]roken and fractured bones do not generally qualify as a disability within the meaning of the ADA.") Guary v. Upstate Nat'l Bank, 618 F. Supp. 2d 272, 275 (W.D.N.Y. 2009) (finding that plaintiff's broken ankle, "which resulted in a single, twelve-week disability leave with no alleged physical limitations thereafter, is not a disability for purposes of the ADA"). Moreover, assuming that Plaintiff's foot injury rendered her disabled under the ADA, the evidence in the record demonstrates that the decision to terminate Plaintiff's employment was made prior to her foot injury on June 26, 2015, for time and attendance issues, and was only delayed as a result of Plaintiff's injury that day.

[18] Plaintiff contends that stress induced by Arzberger required her to take time off and that Defendant did not provide "an alternative work environment." (Pl. Aff. in Resp. 3.) To the extent Plaintiff asserts an ADA failure to accommodate claim, the claim fails. A plaintiff states a prima facie failure to accommodate claim by alleging that: "(1) plaintiff is a person with

*See Fox*, 918 F.3d at 73 (affirming the district court's dismissal of the plaintiff's reasonable accommodation claim where the plaintiff "never asked for an accommodation" because the plaintiff could not identify "a reasonable accommodation that [the defendant] refused to provide"); *Vitti v. Macy's Inc.*, 758 F. App'x 153, 158 (2d Cir. 2018) (finding that the plaintiff "fail[ed] to establish denial of a reasonable accommodation because she never requested one").

### f.  Breach of contract claim

Defendant argues that Plaintiff's breach of contract claim must be dismissed because Plaintiff is an at-will employee.  (Def. Mem. 25.)

Plaintiff contends that Defendant altered her contract without her consent by changing her work hours from 9:00 PM to 7:00 AM, to 9:00 PM to 7:15 AM.  (Pl. Aff. in Resp. 2–3.)

In order to assert a claim for breach of contract under New York law,[19] the plaintiff must allege "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of the defendant to perform; and (iv) damages."  *Orchard Hill Master Fund Ltd. v. SBA*

---

a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (quoting *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006)); *see also Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 73 (2d Cir. 2019) (same).  As discussed above, Plaintiff testified during her deposition that she did not tell Arzberger or anyone in HR about her PTSD because she was "not required to divulge [her] disability."  (Cousar Dep. 152:19–21, 153:6–12.)  Plaintiff also testified that she did not need any assistance in doing her job.  (Cousar Dep. 153:13–17.)  Moreover, Plaintiff has not presented any evidence that she requested any accommodation or that Defendant refused to provide a reasonable accommodation.  Accordingly, Plaintiff fails to demonstrate a *prima facie* failure to accommodate claim.

[19]  Because all of the conduct at issue occurred in New York, the Court assumes that New York law governs the dispute.  *See Vacold LLC v. Cerami*, 545 F.3d 114, 122-23 (2d Cir. 2008) (holding that New York law applies where a substantial amount of the conduct at issue underlying the contract-formation dispute occurred in New York and the defendant raised no objection to the application of New York law).

*Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) (internal quotation marks and citation omitted); *Hudson & Broad, Inc. v. J.C. Penny Corp., Inc.*, 553 F. App'x 37, 39 (2d. Cir. 2014) (same). "Under New York law, 'employment for an indefinite or unspecified term is presumed to be at will and freely terminable by either party at any time without cause or notice.'" *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 231 (2d Cir. 2014) (quoting *Reddington v. State Island Univ. Hosp.*, 511 F.3d 126, 137 (2d Cir. 2007)).

Plaintiff fails to establish that the Scheduled Hours form is an employment contract. Plaintiff contends that the Scheduled Hours form is a contract that required her to only work until 7:00 AM but was illegally changed to suggest that she was required to work until 7:15 AM, thereby breaching her contract. However, Plaintiff also testified during her deposition that at some time during the beginning of her employment, she was "told that [she] needed to clock out at 7:15 [AM]" and was later told that "the schedule reflects those particular days that [she is] supposed to do 7:15 [AM]." (Cousar Dep. 36:18–25.) Moreover, the evidence before the Court establishes that the Scheduled Hours form is only an agreement setting out the terms of her employment, including her salary and working hours. The form indicated Plaintiff's work hours as requiring her to work until 7:15 AM. (Scheduled Hours.) The Scheduled Hours form also includes the following language: "I understand and agree with the above scheduled hours. Offer is contingent upon satisfactory EHS,[20] reference and background checks and Primary Source Verification. Flex time is [thirteen] shifts in a [four] week period. I have reviewed and understand my job description." (*Id.*) In addition, the form indicates that it is to be completed by the "Nurse Manager or designee and electronically forwarded to Nurse Recruitment." (*Id.*) The Scheduled Hours form also includes a separate section to be completed by "nurse

---

[20] The record does not define "EHS."

recruitment," that indicates Plaintiff's salary as "$34.547," [d]ifferential," benefits, and probationary period.[21] (*Id.*) The Scheduled Hours form also includes the signature of a witness, although the name is ineligible. (*Id.*) The Scheduled Hours form does not specify the length of Plaintiff's employment. (*See generally id.*).

Contrary to Plaintiff's argument that the Scheduled Hours form is an employment contract, the evidence in the record establishes that Plaintiff was an at-will employee. Plaintiff's signed employment application specifically states, "I further understand that if I am employed, it is at-will subject to this institution's right to change or terminate my employment at any time." (Employment Application.) "Case law dictates that when parties have an employment contract terminable at will, the contract can be modified and different compensation rates fixed without approval of the other party since the dissatisfied party has a right to leave his employment." *Gen. Elec. Tech. Servs. Co. v. Clinton*, 577 N.Y.S.2d 719, 720–21 (App. Div. 1991); *see Kronick v. L.P. Thebault Co.*, 892 N.Y.S.2d 895 (App. Div. 2010); *see also Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 32–33 (S.D.N.Y. 2010) ("If an employer changes the terms of its employee's at-will employment contract 'and the employee chooses to remain in the employer's employ after being advised of that change, the employee is deemed to have acquiesced to the new terms of employment and cannot later claim compensation based on the terms of the original contract.'" (quoting *In re Footstar, Inc.*, No. 04-CV-22350, 2007 WL 1989290, at *5 (Bankr. S.D.N.Y. July 6, 2007))). Even assuming Plaintiff's Scheduled Hours form originally indicated that Plaintiff's shift was from 9:00 PM to 7:00 AM, Plaintiff was informed by telephone and in writing that she was required to remain on the job until 7:15 AM, and Plaintiff chose to remain employed by Defendant. Because Plaintiff chose to remain

---

[21] The Scheduled Hours form includes additional writing that is not legible.

employed with Defendant after being advised of the purported change in her work hours, Plaintiff cannot now assert a breach of contract claim for the change in work hours.

Lastly, because Plaintiff's employment was at-will, Defendant was entitled to terminate Plaintiff's employment "at any time without cause or notice." *Reddington*, 511 F.3d at 137; *see also Langenkamp v. Olson*, 628 F. App'x 50, 51–52 (2d Cir. 2015) (finding that the plaintiff's employment was at will and freely terminable where the plaintiff relied on his offer letter promising a certain annual salary); *Brown*, 756 F.3d at 231–32 (finding that the plaintiff's employment relationship with his employer was not "anything other than at will" where the plaintiff's "employment was not governed by a written contract" and the defendant's reassurances that the plaintiff would not be terminated for financial reasons was insufficient to establish an implied contract).

The Court therefore grants Defendant's motion and dismisses Plaintiff's breach of contract claim.

### g. Motion for leave to file a second amended complaint

Plaintiff moves for leave to file a Second Amended Complaint ("Proposed SAC"), to add a cause of action under 42 U.S.C. § 1981 and to add claims against Arzberger, Orlando, Kristin Friedl, Steve Ritchie, Seditas, and Jane and John Does. (Pl. Aff'm 1; Proposed SAC, Docket Entry No. 77-1.) Plaintiff further requests that she be allowed to conduct discovery in light of the additional, "indispensable parties." (Pl. Mem. 3.)

Defendant argues that Plaintiff's proposed amendment is untimely, unfairly prejudicial, and made in bad faith. (Def. Opp'n 6–8.) Further, Defendant argues that the proposed additional defendants are not indispensable parties, that Plaintiff has had "ample opportunity" to complete discovery, and that further discovery would cause unfair delay and prejudice to Defendant. (*Id.*

at 12–14.)

Rule 15 of the Federal Rules of Civil Procedure provides that courts "should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has stated that "[t]his permissive standard is consistent with our strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (citation omitted). Leave to amend should be given "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *see also Couloute v. Ryncarz*, No. 11-CV-5986, 2012 WL 541089, at *3 (S.D.N.Y. Feb. 17, 2012) (quoting *Monahan*, 214 F.3d at 283). However, motions to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008); *Monahan*, 214 F.3d at 283.

"Although 'a court should freely give leave to amend where justice so requires,' Fed. R. Civ. P. 15(a)(2), 'this must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause.'" *Manuel v. Pepsi-Cola Co.*, 763 F. App'x 108, 109 (2d Cir. 2019) (quoting *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009)); *see* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). Whether good cause exists turns on the diligence of the moving party and whether the moving party's amendment would significantly prejudice the non-moving party. *See Emengo v. Stark*, No. 18-CV-1942, 2019 WL 2206250, at *2 (2d Cir. May 22, 2019) ("The 'primary consideration' in assessing good cause is the 'diligence' of the moving

party." (citing *Kassner v. 2nd Ave. Deli. Inc.*, 496 F.3d 229, 244 (2d Cir. 2007))); *see also*

*Werking v. Andrews*, 526 F. App'x 94, 96 (2d Cir. 2013) ("We will find 'good cause' where the

moving party has demonstrated 'diligence' . . . and the amendment would not significantly

prejudice the nonmoving party." (first citing *Parker v. Columbia Pictures Indus.*, 204 F.3d 326,

340 (2d Cir. 2000); and then citing *Kassner*, 496 F.3d at 244)); *Holmes*, 568 F.3d at 334–

35 ("[T]he lenient standard under Rule 15(a), which provides leave to amend 'shall be freely

given,' must be balanced against the requirement under Rule 16(b) that the Court's scheduling

order 'shall not be modified except upon a showing of good cause . . . .' Whether good cause

exists turns on the diligence of the moving party.") (citing *Grochowski v. Phoenix Constr.*, 318

F.3d 80, 86 (2003) (quoting older versions of Rules 15(a) and 16(b) of the Federal Rules of Civil

Procedure)).

Having reviewed the proposed SAC, the Court finds that amendment would be futile. As

to Plaintiff's proposed section 1981 claim, claims of discrimination under section 1981 are

analyzed under the same standard as a Title VII claim. *Vargas v. Morgan Stanley*, 438 F. App'x

7, 9 (2d Cir. 2011) (analyzing Title VII and section 1981 discrimination claims under the same

standard). Plaintiff's proposed section 1981 claim is based on Arzberger's treatment of Plaintiff

as compared to her non-African-American counterparts. However, in light of the record before

the Court, Plaintiff's section 1981 claim would fail for the same reasons her Title VII race

discrimination based on disparate treatment claim fails — Plaintiff fails to provide any evidence

from which the Court can infer that Arzberger treated similarly-situated ORTs different on the

basis of their race, color, or national origin.

In addition, Plaintiff alleges that she is a war veteran suffering from PTSD, that her

PTSD "became activated and exacerbated" during her employment, and that she provided

Arzberger "a note to be out of work for four days." (Proposed SAC ¶ 25.) However, Plaintiff testified under oath that she did not inform Defendant of her disability and did not request any accommodation for her purported disability. Plaintiff's explicit deposition testimony was that she "at no time" requested an accommodation in performing her job duties. (Cousar Dep. 153:6–21.) In light of the evidence before the Court, the Court finds that amendment would be futile.

## III. Conclusion

For the foregoing reasons, the Court grants Defendant's motion for summary judgment, denies Plaintiff's cross-motion for summary judgment, and denies Plaintiff's motion for leave to amend. The Clerk of Court is directed to enter judgment for Defendant and close this case.

Dated: August 26, 2019
      Brooklyn, New York

SO ORDERED:

      s/ MKB
MARGO K. BRODIE
United States District Judge